KLIEBERT, Judge.
First Progressive Bank (hereafter the Bank) brought a “via executiva” foreclosure suit against Jolanda Costanza on a promissory note in the amount of $10,929.88 secured by a chattel mortgage on a 1979 Lincoln Continental sold by the Bank to Costanza. The suit resulted in a seizure of the Lincoln followed by a sheriff’s sale of same for $5,670.00. The Bank then sought a deficiency judgment against Costanza for $9,705.60. Based on a finding the sale by the Bank to Costanza contained a suspen-sive condition, the trial judge dismissed the Bank’s suit. The Bank brought this devolu-tive appeal. We affirm.
On October 24, 1980, the Bank sold the Lincoln Continental (it had been repossessed from a previous buyer) to Costanza for $10,929.88 on a single installment note due on January 25, 1981. Costanza voluntarily surrendered the automobile to the Bank sometime prior to the due date, stating “I can’t buy the car, the sale of my house fell through”. The sale and financing documents make no mention of the contingency, i.e., the sale of her house testified to by Costanza. No objection was made to Costanza’s testimony relative to the contingency when it was offered.
*595 At the trial, Mr. Thomas Gordon, a bank official, testified that at Ms. Costanza’s request he had been looking for a car for her and when he informed her he had located one, their conversation went as follows:
“I told her I had a car that was suitable, certainly. She said, ‘I’m going to sell a piece of real estate and I’m a (sic) have enough money to put down on the car or I might pay all of it cash.’ I said, ‘Well, I would finance the six thousand.’ ($6,000.00) That’s the discussion we had."
He was at the hospital, however, when the bill of sale and financing documents were executed by Mr. Rachal, also a bank official, and Mrs. Costanza.
Ms. Costanza testified her conversation with the Bank official was as follows:
“Q. Now, do you remember the discussion that you had with Mr. Gordon, that if you didn’t pay all cash for the car that you would be permitted to make a $4,000.00 down payment on the vehicle?
A. No, ah — I told Mr. Gordon that I was going to pay cash for the car, and he wouldn’t let me have the car unless I were to put $4,000.00 down on the ear. And I told him the only way I would be able to buy the car would be if the sale of this house would go through; I would pay this whole ten thousand ($10,000.00) cash because I didn’t want to have any notes or have that, you know, hanging on me. And that was the deal that we made.
Q. Then before Mr. Watts asks you the question, then why did you sign this document, the note and other documents involved in this sale?
A. Mr. Rochelle said, ‘Sign here, sign here, and sign here,’ and that’s how he gave me the car.
Q. And you did not make any down payment at that time, did you?
A. No, I did not make any down payments at all. It was gonna be sold — the house was gonna be sold and I was to bring in the ten thousand ($10,000.00) for the car.”
She also testified that after she informed the Bank that her real estate sale had not materialized, the Bank had made efforts to sell the car for her in Galiano. This was denied by Mr. Rachal and Mr. Gordon.
Additionally, with respect to her understanding of the transaction she entered into with the Bank, she testified as follows:
“Q. You did want this car, am I not correct?
A. Yes, I did want the car. And I was to pay for the car with the sale of the house, that was the agreement.—
Q. Okay. And—
A. Because I couldn’t of bought the car otherwise, if I didn’t sell the house.
Q. Well, is the note in this matter structured so that you would have time to sell the house, is that not correct; the note was due in three months?
A. They were talking to the buyer for my house and whenever he would tell Mr. Rachal and Mr. Gordon the same thing and we were just waiting for him to get the money, that he was going to buy the house. It was that he was buying the house, and I was gonna buy the car. That’s exactly the way that it went. Because I couldn’t afford that ten thousand dollar ($10,000.00) car if I wouldn’t sell the house.”
Mr. Jessie Rachal, the Bank official who executed the financing documents and the sale with Ms. Costanza, testified on direct examination that the note was set as a single installment note maturing in three months in order for Ms. Costanza to refinance the car in the event the sale of her real estate did not materialize. Further, according to his testimony, it was never the intention of the Bank to allow Costanza to merely use the Continental until she sold her real estate. When asked on cross-examination whether he was aware of the real estate sale to be made by Ms. Costanza, his reply, however, was as follows:
“Q. So, the sale originally with Mr. Gordon and the Progressive Bank was *596 predicated upon the sale of a piece of real estate?
(No response by the witness)
Q. Would you say yes or no?
A. Oh, I would say yes.”
Based on this testimony, we cannot say the trial judge erred in concluding the sale of the automobile was conditioned upon the sale of the real estate as is contemplated by LSA-C.C. Article 1897 which provided in pertinent part as follows:
“The contract is also considered as being without cause when the consideration for making it was something which, in the contemplation of the parties, was thereafter expected to exist or take place, and which did not take place or exist....”
Thus, the legal issue on appeal is whether the parol evidence was properly admitted in evidence. Although it is true that parol evidence is admissible only when the agreement is ambiguous, unless objected to at the time of trial the objection is waived. La.C.C. Article 2276. Wade v. Joffrion, 387 So.2d 1265 (La.App. 1st Cir. 1980). Here the Bank failed to object to parol evidence at the time it was offered.
Accordingly, the judgment of the trial court is affirmed. The Bank is to pay all costs of the appeal.
AFFIRMED.